# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

CARLOS ALBERTO EUDAVE,

    Petitioner,

    v.

HATTON,

    Respondent.

Case No. 1:18-cv-00943-LJO-EPG-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Carlos Alberto Eudave is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner raises the following claims for relief: (1) insufficient evidence to support the jury's true finding on the gang enhancement allegation; (2) erroneous imposition of 15-year minimum parole eligibility term under California Penal Code section 186.22; (3) clerical error in the abstract of judgment; (4) instructional error; and (5) insufficient evidence to support the verdicts.

For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

On September 19, 2014, Petitioner was convicted by a jury in the Tulare County Superior Court of premeditated attempted murder. The jury found true the special allegations that the offense was committed for the benefit of a criminal street gang and a principal personally and

intentionally discharged a firearm, causing great bodily injury. (CT[1] 216–17). On February 17, 2015, Petitioner was sentenced to an imprisonment term of life with the possibility of parole plus twenty-five years to life. (13 RT[2] 1428). On February 27, 2017, the California Court of Appeal, Fifth Appellate District affirmed the conviction, struck the gang finding, remanded for resentencing, and directed the trial court to correct the clerical error[3] in the judgment. People v. Eudave, No. F071096, 2017 WL 749010, at *1, *20 (Cal. Ct. App. Feb. 27, 2017). On June 14, 2017, the California Supreme Court summarily denied Petitioner's and his codefendant's petitions for review. (LDs[4] 27–29).

On July 13, 2018, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). Respondent filed an answer to the petition. (ECF No. 15).

**II.**

**STATEMENT OF FACTS[5]**

On September 5, 2012, Jovany Ruiz was wounded in a drive-by shooting. Carlos Alberto Eudave and Ramon Barajas, Jr. (Eudave and Barajas, respectively; collectively, defendants) were separately charged as a result of the incident.

. . .

**PROSECUTION EVIDENCE**

*The Shooting*

In September 2012, Ruiz resided with his parents on Tobias Road in Poplar.[6] He affiliated with the south, which caused a conflict with Northerners. Most of the students at the charter school he attended affiliated with Sureños, i.e., south. Sureños usually identified with the color blue. Norteños (north) usually identified with the color red.

Ruiz was acquainted with defendants, as Poplar was a small town where most people knew each other.[7] Both were Norteños. On one occasion prior to the shooting, Ruiz was in a store in Poplar with two of his friends. Barajas was

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on November 5, 2018. (ECF No. 16).
[2] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on November 5, 2018. (ECF No. 16).
[3] The abstract of judgment had erroneously showed that Petitioner was sentenced to life in prison *without* the possibility of parole on count 1. People v. Eudave, No. F071096, 2017 WL 749010, at *20 (Cal. Ct. App. Feb. 27, 2017).
[4] "LD" refers to the documents lodged by Respondent on November 5, 2018. (ECF No. 16).
[5] The Court relies on the California Court of Appeal's February 27, 2017 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).
[6] Unspecified references to dates in the statement of facts are to the year 2012.
[7] Ruiz did not know exactly where Eudave lived, but assumed he lived in Poplar because he was there all the time. Ruiz frequently saw him in Barajas's company. Ruiz knew the exact house in which Barajas lived.

coming out of an alley on a bicycle and started saying Ruiz's group "bang [ed]." Ruiz ignored him, whereupon Barajas pulled out a gun. Ruiz's group walked back to the store. On another occasion, Ruiz and a friend were in front of Ruiz's house when Barajas and some others passed by in a van. Barajas pulled out a gun and "flashed" it, although he did not point it at anyone.

On the afternoon of September 5, Ruiz, Ulysses Pimental, Elias Pompa, and Cristo Alvarado were smoking marijuana in the front yard of Pimental's house, which was down the street from Ruiz's residence. Like Ruiz, the others were not Sureños, but "just h[u]ng out with them."

Ruiz and the others were sitting in a circle on some chairs when Barajas passed by in his car, going south. The car was going "kind of slow." Barajas and Ruiz's group looked at each other and Barajas left. About five minutes later, Barajas came back by, going north.[8] This time, Eudave was with him. Ruiz could see him very clearly. Eudave was in the front passenger seat. The window was down. Eudave was sitting on the window sill with his legs inside the car and the upper part of his body turned. Ruiz had his back to Eudave, but turned when Eudave said "[N]orte" and his gang. Ruiz believed the car stopped, although it could have been moving forward very slowly. Ruiz saw Eudave point a handgun at him, then heard shots. He and his companions ran. Ruiz could clearly see that Eudave was shooting at them and Barajas was driving. Ruiz threw himself behind a bush and heard the car leave.[9] At first, he did not realize he had been shot. Then he saw blood squirting from his side. His neighbor said she would take him to the hospital because it would take an ambulance too long to get there.

On September 5, Brenda Harris lived at the corner of Avenue 145 and Tobias. Around 2:15 p.m., she saw Barajas's red car drive past. She did not know who was driving.[10] She knew Eudave by the nickname "Cartoon." She had seen him

---

[8] Pompa estimated that the car came back by about 10 to 15 minutes later. Alvarado estimated less than five minutes elapsed between the two passes.

[9] Pompa heard someone say, "What's up fool." He saw arms coming out of the passenger window, pointing a gun. The person fired, and Pompa ran. Because Pompa was not expecting anyone to be in the car other than Barajas, he was not able to get a good look at the shooter's face. If anyone said "Norte," Pompa did not hear it. Pompa had lived in Poplar for 17 years. To his knowledge, he had never seen defendants together. He had, however, seen Eudave around Poplar. Pompa knew him by the nickname "Cartoon."

Alvarado could not tell whether the car contained a passenger on its second pass. He heard someone call out "Norte," but could not tell if it came from the driver's side or the passenger's side. He then heard shots fired, and he turned around and ran. Alvarado told Tulare County Sheriff's Detective Delacruz there was gang-related music being played in the car. He also told Delacruz the shooter had a unibrow.

Alvarado had seen defendants together in Poplar, "way in the past." When the shooting occurred, he did not see the shooter's hands or arms, nor did he see the gun. He did, however, see the flash coming out of the car.

[10] Harris was not acquainted with Barajas, but identified the car in prosecution photographs as the vehicle she saw. She had seen it several places in Poplar before this occasion. She thought it was a 1991 four-door Honda.

Barajas's mother, Maria Mendez, identified the car in the prosecution photographs as being her family's car. It was a red 1994 Nissan Sentra. Maria Mendez denied that Barajas frequently used the car. On September 5, it was in her possession, as she was taking her mother to her dialysis and doctors' appointments, and visiting her sister, who lived near Wasco and was recovering from surgery. During the first week of September 2012, this was a daily routine for Maria Mendez.

Maria Mendez gave a statement to Delacruz on September 7. She told him she had taken her mother to the doctor on September 6. She said she did not use the vehicle on September 5 and did not know its whereabouts at the time of the shooting. She said Barajas frequently took the vehicle without her knowledge. At trial, Maria Mendez denied telling Delacruz these things. Rather, she said that if Barajas asked for a ride, she or her husband would take him.

Maria Mendez had never seen Eudave with Barajas outside of court.

several times in the neighborhood, but did not know where he lived and did not see him the day of the shooting. She could tell there were two males in the car, although she could not tell who they were. She heard gunshots right after the car passed her house. She did not see anyone sitting on the window sill or recall hearing any yelling coming from the vehicle.

Maribel Alejandre was in her backyard when she heard gunshots. At some point, she saw a young man next door to her house who had been shot. He was bleeding and asked for a ride to the hospital. Alejandre waited a bit because she was told an ambulance had been called, but then she started to drive him to the hospital. They met the ambulance on the way.

Tulare County Sheriff's Deputy Linares responded to the location at which Alejandre met up with the ambulance. Inside the ambulance, Linares observed Ruiz, who had a single gunshot wound to his lower left abdomen. Ruiz informed Linares that he was a Southern gang member who had just been shot by a Northern gang member named "Carlos." Ruiz said he had been "hanging out" with some friends at a residence on Tobias in Poplar. A 1991 or 1992 red Honda Civic, driven by "Raymond," drove by.[11] Carlos was the front passenger, and fired approximately three shots from the vehicle, one of which struck Ruiz. Ruiz said he did not know Carlos's or Raymond's last names, but he knew they were Northern gang members from previous problems he had had with them. He said they lived near his house, but he did not know where. He said nothing about anyone yelling "Norte," but Linares did not ask. Linares was concerned with getting essential information to help locate the crime scene and suspects, and he knew Ruiz was going to be transported soon due to his injury.

Tulare County Sheriff's Deputy Doyle was dispatched to the area of Tobias and Avenue 145 at 2:52 p.m. on September 5. He was advised there was a subject with a gunshot wound, and possibly a red, four-door Toyota car was involved in the incident.[12] Doyle found three fresh nine-millimeter shell casings in the roadway at various distances from the house on Tobias at which the victims were. The presence of shell casings indicated the firearm was a semiautomatic rather than a revolver.

Ruiz ultimately was taken by helicopter to a hospital in Fresno, where he immediately underwent surgery.[13] He was hospitalized for six days. While he was in the hospital, Delacruz took a statement from him and showed him photographic lineups. Two of these contained different photographs of Eudave, while the other contained a photograph of Barajas.[14] Ruiz immediately identified all three photographs of defendants as being the people he had seen during the incident.

---

[11] At trial, Ruiz identified photographs of Barajas's car. He testified he was certain it was the car he saw. He explained that when he was in the ambulance, he did not say it was a Honda Civic; rather, he said it was a burgundy box car like a Honda Civic. He was more familiar with Hondas, and the cars looked somewhat similar. He had seen Barajas drive the red car on many occasions.

When Pompa described the car to Delacruz, he said it had black rims. As shown in the prosecution photographs, the car belonging to Barajas's family had silver rims.

At trial, Alvarado testified that prior to the shooting, a red car passed by. He had seen the car depicted in the prosecution photographs "around," but was not sure it was the car he saw the day Ruiz was shot. There were a number of small, older-model, red cars around Poplar.

[12] The car subsequently was described as a Honda.

[13] A bullet fragment was recovered from his abdomen.

[14] Two photographic lineups containing different pictures of Eudave were used because of different hairstyles Eudave had had in the past.

4

While in the hospital, Ruiz reported the gun was a revolver. He made this assumption because he had seen Barajas with a revolver in the past. He had not previously seen Eudave with a gun.

The day after the shooting, Tulare County Sheriff's Detective Bruce located the red Nissan Sentra depicted in prosecution photographs in front of a residence at Kilroy and Avenue 146, in Poplar. On September 7, the inside window frames on the right side of the vehicle were processed for gunshot residue. Several consistent particles of gunshot residue were found on the right front window. Many more such particles were found on the right rear window. This was an indication the vehicle could have been moving when the weapon was fired.[15]

### *Gang Evidence*

Tulare County Sheriff's Sergeant Derington, who spent approximately four years in the gang unit and was assigned to the south county area that included Poplar, had had a number of contacts with defendants, although not when the two were together. She spoke to Eudave several times, either consensually or during investigations. He was always forthcoming about his gang involvement, and always admitted he was a Northern gang member. Specifically, he was a member of the Poplar Original Gangsters (POG), the Northern street gang in Poplar. He had tattoos and the moniker "Cartoon."[16] On one occasion, Derington contacted Eudave outside a residence on Kilroy in Poplar. Other Northern gang members lived there, and Derington had seen Eudave there before.[17] Eudave was arrested for the Ruiz shooting after being detained with approximately seven other Northern gang members following a disturbance at an apartment complex in Tipton that was a known Northern gang hangout.

In January, Derington spoke to Barajas while he was with a group of other Northern gang members and affiliates with whom Derington was familiar. Derington concluded Barajas was a member of POG because of his admissions, his clothing, his associating, and the fact he was housed with Northern gang members in custody. At the time Barajas's residence was searched on September 7, there was POG and Northern graffiti adjacent to and across the street from the house. In addition, a red shirt, red bandanas, and an envelope with "POG" written on it were found inside Barajas's bedroom. Also found were items bearing gang writing, including "X4," "Poplar," "Norte," and "Norteño."

Delacruz, who was assigned to the gang unit, had extensive training and experience with gangs over the course of the more than 20 years he had been a

---

[15] Debra Kowal, the criminalist who analyzed the gunshot residue kit, explained that "characteristic" particles contain all three elements of the primer, specifically lead, barium, and antimony. "[C]onsistent" particles contain either lead only, lead and barium, or lead and antimony. Such particles can be distributed from the discharge of a firearm or from being nearby when a firearm was discharged, but they can also come from an environmental source. Kowal could not say for certain the car contained gunshot residue because a gun was fired from it.
    According to Detective Meek, who processed the vehicle, had the shooter been sitting on the window frame outside of the vehicle with the vehicle moving, there probably would have been no gunshot residue.

[16] Doyle, who had been a community-based officer in Poplar for five to six years at the time of the shooting, had twice seen the moniker "Cartoon" in graffiti a couple blocks from the location of the Ruiz shooting, possibly within months before the incident.

[17] This was the residence of Eudave's cousins. His mother lived in Tipton, and Eudave always gave Derington the address of the Tipton residence. Although Derington's south county patrol area included Tipton, she had always contacted Eudave in Poplar, which was approximately 10 miles from Tipton. On September 5, Derington searched the Tipton residence. No gun or ammunition was found. Eudave's mother reported Eudave had moved out within the past two weeks, and she did not know where he was. Although he came to the house once in a while, she said he had not been there for a couple of days.

sworn peace officer. He testified as an expert on criminal street gangs in Tulare County.

Delacruz explained that a criminal street gang is three or more persons claiming the same color, sign, or symbol, and committing crimes. There are hundreds of gangs. Gang members in general gain respect within their gang by "put[ting] in work," i.e., representing their gang and committing crimes for the gang's benefit. Gang members typically identify themselves by colors, clothing, hand signs, hairstyles, or tattoos; however, not all gang members have tattoos or "carry their colors." Even so, they are known within the gang community because of their history.

Delacruz described the Norteño gang as a group of persons who sympathize with the prison gang Nuestra Familia. They identify with the number 14, which stands for N or "ene," the 14th letter of the alphabet, and claim the color red. The primary activities of the Norteño street gang are murder, attempted murder, drive-by shootings, shootings, stabbings, vandalism, graffiti, carjacking, robbery, extortion, and weapons violations.

Delacruz explained that the umbrella gang is the Norteños, but there are also subsets or cliques. POG is one of a number of Norteño subsets in Tulare County. POG's are Norteños from Poplar. According to Delacruz, not all gang members are in subsets, however, and might simply claim North and be Northerners or Northerner sympathizers. Delacruz did not know the number of POG members or who the leader was. He explained that the Tulare County Sheriff's Department classifies Northerners and Southerners as such without breaking those gangs down into their subsets.

Delacruz explained that the primary rivals of the Norteños or Northerners are Sureños or Southern gang members. These gang members come from "la eme," the Mexican Mafia prison gang. They identify with blue and the number 13, which stands for M or the 13th letter of the alphabet. There is a history of violence between the Norteños and the Sureños, including in Tulare County.

In preparing supplemental gang opinions (gang packets) in connection with criminal cases, Delacruz first tries to establish whether the person under investigation is a gang member. There are 10 criteria that are used; in Tulare County, the person must meet three in order to be identified as a gang member.

There must also be two predicate offenses. For purposes of the present case, Delacruz used an incident that occurred in the Terra Bella area on January 31, 2011. Gabriel Mejia drove past a group of individuals by a middle school. He stopped, got out of the truck, and approached them. He asked, "What's cracking?" and pulled out a handgun. He asked if they were Southerners or if they were gang-bangers, then got back in his vehicle and left. As a result of the incident, Mejia was convicted of firearms offenses and a gang enhancement. At the time, he was a Norteño gang member. In Delacruz's opinion, Mejia committed the crime in order to gain respect and to be feared by citizens of the area, and for the benefit of the gang.

The second predicate offense occurred in Woodville on April 16, 2011, and involved Alberto Farias and Clint Gilbert, both of whom were Northern gang members. Two known Southern gang members from the area were traveling on one of the roads when Farias and Gilbert saw them. Farias, the passenger, instructed Gilbert, the driver, to pull up next to them. Gilbert complied. Shots

were fired at the victims, who had a single vehicle accident. As a result of the incident, Gilbert and Farias were convicted of attempted murder, weapons charges, and a gang allegation. In Delacruz's opinion, this was a gang-related crime, in that Northerners attempted to "take out" rival gang members.

In preparing his gang packet for this case, Delacruz looked for defendants' law enforcement contacts. Eudave had a number of contacts with a probation officer between April 2008 and August 2008, involving such things as gang writing and tagging, using the school Internet to view gang-related Web sites, and testing positive for drugs. On June 13, 2008, Eudave admitted he was an associate with Northern gangs and specifically affiliated with Varrio Poplar Norte, also known as VPN. Eudave also had a number of law enforcement contacts between February 2008 and his arrest in this case. In one, which took place on August 21, 2010, Eudave admitted being a Northerner from Poplar, although he resided in the Tipton area. On April 10, 2012, he was contacted with several known Northern gang members, and admitted he was active with POG. He had several POG and Northern tattoos. During a contact on July 29, 2012, Eudave told Delacruz that he was a gang member and had gang tattoos, and his monikers were Cartoon, Uni, and Unibrow. On three occasions, including following his arrest in this case, Eudave was booked into jail and admitted, for classification purposes, he was a Northern gang member.

Delacruz also prepared a gang packet pertaining to Barajas. Between August 2008 and December 2008, Barajas was involved in several gang-related confrontations at his school. He admitted claiming Norte on at least two of those occasions. Between March 2009 and May 2011, Barajas had several contacts with the probation department in which he actively claimed North and associated with Northern gang members, and in which gang-related clothing was found in his room. Barajas had several law enforcement contacts between May 2009 and August 2013 in which he was found to be associating with Northern gang members and wearing gang attire. During the contact on November 3, 2011, Barajas told a deputy he associated with Northern gang members. On January 6, 2012, Barajas admitted being a Northern gang member with POG. On April 20, 2012, an investigation into a verbal argument in which several Northern gang members were involved revealed the reporting person had heard one of the gang members ask Barajas for a gun, and Barajas had lifted his shirt as if he was going to remove a gun.[18] On three occasions, Barajas stated on jail classification questionnaires that he claimed North.

Based on all the information, Delacruz opined that at the time of the shooting in this case, defendants were active Northern gang members belonging to the POG subset. That Barajas, whose moniker was Ray Ray, did not have tattoos did not mean he was not a gang member, as older gang members instructed and educated younger gang members not to have gang-related tattoos.

In Delacruz's experience, it is difficult to get witnesses to come forward in gang-related cases. The majority of such crimes are committed in small communities, where everybody knows everyone else, and people are afraid of retaliation. In addition, it is difficult to get rival gang members—even those who are victims—to cooperate in gang-on-gang crimes. They are told by the hierarchy in the prison gangs not to testify in court or against a rival gang member.

---

[18] Eudave was contacted later at the same house, but was not seen with Barajas or involved in the incident. In none of the law enforcement information Delacruz had was there any report defendants were seen together as members of the same gang.

In Delacruz's opinion, if a POG shot at a Southern-affiliated juvenile, it would constitute putting in work for the gang. The shooter would elevate himself within the gang. In response to a hypothetical question that tracked the prosecution evidence in this case, Delacruz opined the shooting was committed for the benefit of the Northern gang, because Northern gang members have been instructed to shoot and assault their rivals, the Southerners. Doing so shows their loyalty to the gang, allowing them eventually to be known as someone to be feared. The crime benefited them by showing they were willing to put in this work, and eventually they could be promoted within the ranks of the gang. The crime was committed to benefit the gang overall by showing the Southerners that this was Northern territory, and the Northerners wanted the Southerners out of town.

## DEFENSE EVIDENCE

### *The Shooting*

As of September 5, Maria Chavez resided on South Adams in Tipton. Eudave sometimes lived with her and her family. During that time, he frequently went back and forth to his mother's house. Chavez never knew Eudave to be violent or mean, and never saw him with a gun.

Eudave was arrested in connection with this case outside Chavez's apartment complex. He was staying with her and her family on September 5. Although she could not account for his whereabouts for the entire day, he would always be with her between 2:00 and 3:00 p.m., because he would be waiting for her husband to get off work. Eudave never had a car. Chavez and her family provided him with transportation. He never had anyone over to the house, and Chavez had never seen Barajas before she testified. Between September 5 and his arrest September 7, Eudave never acted weird or nervous. He seemed to have nothing to hide.

Jose Martinez was Chavez's husband. He confirmed Eudave was living with them on September 5. He described Eudave as a calm person. In the approximately 10 years they had known each other, Martinez had never seen Eudave get into a fight, or have weapons or guns. Between September 5 and his arrest on September 7, there was nothing unusual about Eudave's behavior.

Darlene Palafox was the mother of Barajas's child, with whom she was pregnant on September 5. During September, she and Barajas went to work in the fields at the beginning of the month, but then stopped and stayed home because she got sick when she was working.[19] They stayed at Barajas's house on Kilroy. Palafox heard about the shooting a couple days after it happened. Barajas was with her all of September 5. The red car that his mother drove was not at home. Barajas never drove the car that day.

On September 5, Lionoso Arredondo lived two houses away from where the shooting took place. He saw the car from which the shots were fired. The car shown in the prosecution's photographs was not the car that was involved. Although the car that was involved was a red Honda, the same color as in the photographs, it had a spoiler on top of the trunk. It passed once, turned around, and on the second pass, the shots were fired. The shooter was pointing his gun through the window of the car. Arredondo did not get a good look at him because he kind of ducked down when he saw Arredondo. At no time did Arredondo see someone sitting on the vehicle window.

---

[19] When in the fields, they wore bandanas of various colors, including red.

Maria Mendez's sister, Blanca Mendez, confirmed Maria Mendez drove her red car to Blanca Mendez's home every day during the first week of September. Maria Mendez would bring the sisters' mother after the mother's dialysis appointment in the morning and would stay at least until 3:00 p.m., sometimes longer. During this time, Blanca Mendez lived on a ranch surrounded by almond trees. There was dove hunting going on close by.

Ramon Barajas, Sr., is Barajas's father. The red Nissan Sentra was driven by Ramon Barajas, Sr., and his wife. Barajas never drove it, since he did not have a driver's license and his father would not lend him the car.

### *Eyewitness Identification Evidence*

Robert Shomer testified as an expert on eyewitness identification. He held a doctorate degree in experimental psychology, the field of study that focuses on human beings' perception and memory and the degree to which an accurate identification can be made under stress.

Based on Shomer's training and experience, one of the major, consistent findings in the area of eyewitness identification is that such identification occurs at a very low level of accuracy and reliability. Shomer explained that recording images in one's brain is not a photographic process. Stress very strongly negatively impacts the accuracy of eyewitness identification. In addition, people often blend what they actually saw with what or whom they assume or think they saw. There is almost no correlation between the confidence someone has in the accuracy of his or her identification and the true accuracy of that identification.

According to Shomer, the level of accuracy is affected by numerous factors, particularly the largest source of error: resemblance among people. In addition, anything that affects the brain, such as fatigue or the ingestion of alcohol or drugs—including marijuana—negatively affects how well the brain can make an accurate identification. Marijuana in particular has a very significant distorting effect on perception, including the passage of time and the accuracy of intake of features for the purpose of later eyewitness identification. Life-threatening stress results in a vivid memory of the situation, but the details are far less accurate. When a weapon is involved, not only does it raise the stress level so there is more disruption of the various processes needed for accuracy, but it also acts as a visual magnet. People focus on it and are less accurate about the face of the wielder of the weapon.

If, after a very stressful situation in which someone was shot, the victim says he or she did not know who the perpetrator was, then later tells the police he or she is now sure of the shooter's identity because it is someone the victim knows, it is a classic danger signal related to inaccuracy. If someone known to the victim is responsible for a crime against the victim, one of the first things that should be reported in an accurate report is that the victim knows who did it. A delayed announcement of familiarity is associated with making an assumption that could be influenced by numerous factors, including information from other people and the victim's assessment of who might do such a thing to him or her. In cases of gang-on-gang violence, the victim may not be completely neutral in assigning responsibility for an attack.

Shomer explained that making an identification is making a commitment. The person is committed to the fact he or she now believes the identified person is the perpetrator. Once a person commits, memory changes to support that

commitment. When a person comes to conclude a certain individual he or she knows was the perpetrator and is then shown a photographic lineup that includes a picture of that person, selection of the photograph of that person says nothing about the accuracy of the identification.[20] In addition, the more time that passes between the event and the identification procedure, the more memory decays. The more the decay, the more the loss of accuracy. An in-court identification does not test memory in any valid way. Rather, it elicits someone's commitment in a highly suggestive context.

Due to the nature of eyewitness identification and the factors that can affect it, even a completely honest witness doing his or her best to be accurate can make mistakes in perception and identification of what he or she saw.

Eudave, 2017 WL 749010, at *1–8 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[20] According to Shomer, the same person should never be included in two different photographic lineups, because it sends the message the police are interested in that person. Even without that problem, it is not good practice to put the suspects' photographs in the same position in both arrays, as was done here, because it can create suggestion.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that

1  there was an error well understood and comprehended in existing law beyond any possibility for

2  fairminded disagreement." Id. at 103.

3     If the Court determines that the state court decision was "contrary to, or involved an

4  unreasonable application of, clearly established Federal law," and the error is not structural,

5  habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

6  injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

7  (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

8  (1946)).

9     AEDPA requires considerable deference to the state courts. The Court looks to the last

10 reasoned state court decision as the basis for the state court judgment. See Brumfield v. Cain,

11 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst v.

12 Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state

13 court and the state court has denied relief, it may be presumed that the state court adjudicated the

14 claim on the merits in the absence of any indication or state-law procedural principles to the

15 contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but

16 provides no reasoning to support its conclusion, a federal court independently reviews the record

17 to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709

18 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not de novo review of the

19 constitutional issue, but rather, the only method by which we can determine whether a silent state

20 court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

21 2003). The federal court must review the state court record and "must determine what arguments

22 or theories . . . could have supported, the state court's decision; and then it must ask whether it is

23 possible fairminded jurists could disagree that those arguments or theories are inconsistent with

24 the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

25                                    **IV.**

26                            **REVIEW OF CLAIMS**

27     **A.  Mootness of Claims 1 and 3**

28     In his first claim for relief, Petitioner asserts there was insufficient evidence to support

the jury's true finding on the gang enhancement special allegation. (ECF No. 1 at 14).[21] In his third claim for relief, Petitioner asserts that there is a clerical error in the abstract of judgment. (ECF No. 1 at 29). On direct appeal, however, the California Court of Appeal granted Petitioner relief with respect to these claims by striking the gang enhancement and directing the trial court to correct the clerical error in the abstract of judgment. Eudave, 2017 WL 749010, at *20. As Petitioner has received the remedy to which he would have been entitled had this Court rendered a favorable judicial decision on Petitioner's first and third claims for relief, the Court finds that these claims should be dismissed as moot. See Spencer v. Kemna, 523 U.S. 1, 7 (1998) ("This case-or-controversy requirement subsists through all stages of federal judicial proceedings," which "means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990))).

**B. Instructional Error**

In his second and fourth claims for relief, Petitioner asserts that the trial court erred by failing to instruct the jury to decide whether Petitioner personally discharged a firearm and by failing to instruct the jury on assault with a deadly weapon as a lesser-included offense to attempted murder. (ECF No. 1 at 25–28, 31).

1. Personal Discharge of Firearm

In his second claim for relief, Petitioner asserts that the trial court erred by failing to instruct the jury to decide whether Petitioner, rather than "a principal," personally discharged a firearm. (ECF No. 1 at 25–28). Respondent argues that relief is unavailable because a fairminded jurist could agree with the California Court of Appeal that the instructional error was harmless. (ECF No. 15 at 22).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in Petitioner's petition for review in the California Supreme Court, which summarily denied the petition. As federal courts review the last reasoned state court opinion, the Court will "look through" the

---

[21] Page numbers refer to the ECF page numbers stamped at the top of the page.

summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the instructional error claim regarding personal discharge of a firearm, the California Court of Appeal stated:

> Our conclusion with respect to the gang allegations means neither defendant can be subjected to an enhancement under section 186.22, including the 15−year minimum parole eligibility term specified by subdivision (b)(5) of that statute. The Attorney General concedes it also means the firearm discharge enhancements imposed on Barajas must be stricken, but contends we should still uphold that enhancement as to Eudave. (See generally *People v. Cornejo*, *supra*, 3 Cal.App.5th at p. 50.) We agree.
>
> **A. Background**
> As previously described, defendants were charged in separate cases, which were then consolidated for trial. A consolidated information was never filed.
>
> The information filed in Eudave's case alleged that in commission of attempted murder, Eudave personally and intentionally discharged a firearm, proximately causing great bodily injury, within the meaning of section 12022.53, subdivision (d). With respect to the attempted murder charge, Barajas's information alleged Barajas personally and intentionally discharged a firearm, proximately causing great bodily injury, within the meaning of section "12022.53(d)(e)(1)." With respect to the charge of permitting another to discharge a firearm from a vehicle, Barajas's information alleged Barajas personally and intentionally discharged a firearm, proximately causing great bodily injury, within the meaning of section 12022.53, subdivision (d).
>
> For unknown reasons, despite the inclusion in both informations of enhancement allegations under subdivision (d) of section 12022.53, the trial court failed to instruct the jury with the language of CALCRIM No. 3149. Insofar as is pertinent, that instruction would have told jurors the People had to prove "[t]he defendant personally discharged a firearm" during the commission of the crime; "[t]he defendant intended to discharge the firearm"; and "[t]he defendant's act" caused great bodily injury to a person not an accomplice to the crime. Instead, the court only gave CALCRIM No. 1402. As given, the relevant portion of the instruction told jurors:
>
>> "If you find the defendants Eudave and/or Barajas guilty of the crimes charged in Counts 1 ... and/or Barajas guilty of the crime charged in Count 2, and if you find that said defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, assist any criminal gang activity by gang members, you must then decide whether for each crime the People have proved the additional allegation that one of the principals personally and intentionally discharged a firearm during that crime and caused great bodily injury....
>>
>> "To prove this allegation, the People must prove that, one, someone who was a principal in the crime personally discharged a firearm during the commission of the crime; two, that person intended to discharge the

firearm; three, that person's act caused great bodily injury to another person.

"A person is a principal in a crime if he directly commits the crime or if he aids and abets someone who commits the crime."

The jurors returned verdicts as to both defendants finding true, as to each count, the allegation a principal personally and intentionally discharged a firearm, causing great bodily injury, within the meaning of "section 12022.53(d) and (e)(1)." The trial court enhanced Barajas's sentence on count 1 by a consecutive term of 25 years to life in prison pursuant to "Penal Code Section 12022.53(d) and (e)," and on count 2 pursuant to "Penal Code Section 12022.53(d)." Eudave's sentence on count 1 was enhanced by a consecutive term of 25 years to life in prison pursuant to "Penal Code Section 12022.53(d) and (e)."

**B. Analysis**

Section 12022.53, which applies to attempted murder (*id.*, subd. (a)(1), (18)), provides, in pertinent part:

"(d) Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), ... personally and intentionally discharges a firearm and proximately causes great bodily injury ..., to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

"(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:

"(A) The person violated subdivision (b) of Section 186.22.

"(B) Any principal in the offense committed any act specified in subdivision ... (d)."

As the appellate court explained in *People v. Hernandez* (2005) 134 Cal.App.4th 474, 480: "Section 12022.53, subdivisions (d) and (e)(1)(B) when read together require the trial court to impose a consecutive 25–years-to-life sentence enhancement when a defendant is convicted of [attempted] murder for the benefit of a criminal street gang and '[*a*]*ny* principal in the offense' 'personally and intentionally discharges a firearm and ... causes [great bodily injury], to any person other than an accomplice.' (Italics added.) Under this sentencing regime an aider and abettor who is found guilty of [attempted] murder is subject to the 25 years to life enhancement even though he or she did not personally and intentionally discharge a firearm causing [great bodily injury] if the [attempted] murder was committed for the benefit of a criminal street gang and 'any principal' in the offense personally and intentionally discharged a firearm causing [great bodily injury]. In all other [attempted] killings subject to section 12022.53, subdivision (d)—that is, [attempted] killings not for the benefit of a criminal street gang—a principal, including an aider and abettor, is only subject to the 25–year enhancement if he or she personally and intentionally discharged a firearm causing [great bodily injury]." (Fns. omitted.)

Subdivision (j) of section 12022.53 provides in part: "For the penalties in this section to apply, the existence of any fact required under subdivision ... (d) shall

be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact."[22]

Eudave contends that, despite evidence he was the actual shooter, his firearm enhancement must be stricken because the jury was never asked to find he *personally* discharged a firearm in commission of the attempted murder. To hold otherwise, he says, would violate *Apprendi*. Without directly addressing Eudave's *Apprendi* argument, the Attorney General says the jury's findings can only be construed as concluding Eudave personally discharged the firearm.

As authority for his position, the Attorney General relies in large part on the following quote from *People v. Jones* (1997) 58 Cal.App.4th 693, 710–711: " ' "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." [Citations.]' [Citations.] 'The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [Citation.]' [Citation.] '[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]' [Citation.]"

The problem in the present case is not a mere technical defect or clerical error in the verdict. (Cf., e.g., *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1271; *People v. Jones*, *supra*, 58 Cal.App.4th at p. 711 & cases cited.) Rather, it is the absence of a jury instruction and finding on an element of a sentence enhancement, and as such constitutes federal constitutional error under *Apprendi* and its progeny. (See, e.g., *People v. Selivanov* (2016) 5 Cal.App.5th 726, 757–759, 761, petns. for review pending, petns. filed Dec. 27, 2016, time for grant or denial of review extended to Mar. 27, 2017; *People v. Lobato* (2003) 109 Cal.App.4th 762, 765–766; see also *People v. Nunez and Satele* (2013) 57 Cal.4th 1, 41–42.)

This does not necessarily mean Eudave's firearm enhancement must be stricken, however. As the California Supreme Court has explained, "*Apprendi* error—that is, error in failing to submit a punishment-increasing factual issue to the jury—is subject to harmless error analysis under the beyond-a-reasonable-doubt test of *Chapman v. California*[ (1967) ] 386 U.S. [18, 24 (*Chapman*) ]. [Citation.] Indeed, even when jury instructions completely omit an element of a crime, and therefore deprive the jury of the opportunity to make a finding on that element, a conviction may be upheld under *Chapman* where there is no 'record ... evidence that could rationally lead to a contrary finding' with respect to that element. [Citations.]" (*People v. Davis*, *supra*, 36 Cal.4th at p. 564, quoting *Neder v. United States* (1999) 527 U.S. 1, 19 (*Neder*); accord, *People v. Sengpadychith*, *supra*, 26 Cal.4th at pp. 326–328 [*Chapman* harmless error standard applies to *Apprendi* error in failing to instruct on element of sentencing enhancement]; see also *People v. Flood* (1998) 18 Cal.4th 470, 504–505.)

The showing required by *Neder*, *supra*, 527 U.S. at pages 17 through 19, is "more substantial" than the usual *Chapman* assessment. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1165–1166.) "*Neder* instructs us to 'conduct a thorough examination of the record. If, at the end of that examination, the court cannot

---

[22] We directed the parties to file supplemental briefing on the effect, if any, of the prosecution's failure to plead, with respect to at least some of the counts, an allegation specifically referencing subdivision (e)(1) of section 12022.53. (See *People v. Botello* (2010) 183 Cal.App.4th 1014, 1022–1029.) Since we have concluded the gang findings are not supported by substantial evidence, we need no longer consider this issue.

conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' [Citation.] On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citations.] Our task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' [Citations.]" (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

In the present case, there is no question that, had it been presented with the question, the jury would have found Eudave personally and intentionally discharged a firearm, proximately causing great bodily injury to Ruiz. (See *People v. Selivanov*, *supra*, 5 Cal.App.5th at p. 763.) From the outset, the prosecutor's theory—which was expressly conveyed to the jury—was that Barajas drove the car and Eudave was the shooter. Once the jury concluded defendants were the perpetrators, the issue of who fired the shots was not contested and the evidence was overwhelming. Moreover, jurors' conviction of Barajas for permitting another to discharge a firearm from a vehicle constituted an implied determination, in light of the record evidence, that Eudave was the actual shooter.[23]

Eudave directs our attention to *People v. Salas* (2001) 89 Cal.App.4th 1275 (*Salas*). In that case, the jury was never instructed that the defendant must personally use a firearm in order for an enhancement under section 186.22, subdivision (b)(5) or section 12022.53, subdivision (d) to be returned. Rather, the jury was instructed only that a "principal" had to use a firearm. (*Salas*, *supra*, at p. 1279.) As a result, the Court of Appeal concluded that since the defendant was never found to have personally used a firearm, the 15–year minimum parole eligibility term of section 186.22, subdivision (b)(5) was inapplicable. (*Salas*, *supra*, at p. 1281.) We find the opinion of little assistance to Eudave, since the reviewing court (1) found no unequivocal direct evidence as to the identity of the shooter, and (2) had no occasion to, and did not, undertake a harmless-error analysis.[23]

Eudave, 2017 WL 749010, at *16–20 (footnotes in original).

Applying Chapman v. California, 386 U.S. 18 (1967), and Neder v. United States, 527 U.S. 1 (1999), the California Court of Appeal found that the trial court's erroneous failure to instruct the jury to decide whether Petitioner, rather than a principal, personally discharged a firearm was harmless. Under Chapman, "the test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder, 527 U.S. at 15 (quoting Chapman, 386 U.S. at 24). The Supreme Court has held that when a state court's "Chapman decision is reviewed under

---

[23] In his supplemental reply brief, Eudave asserts that Barajas's convictions cannot be relied upon as a substitute for the lack of a jury finding that Eudave personally discharged a firearm. Given the joint trial, we find it permissible to include the jury's findings with respect to Barajas as part of our harmless-error analysis.

1    AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness*
2    *determination itself* was unreasonable.'" Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) (quoting
3    Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the state court's
4    harmless error determination "was so lacking in justification that there was an error well
5    understood and comprehended in existing law beyond any possibility of fairminded
6    disagreement." Ayala, 135 S. Ct. at 2199 (internal quotation marks omitted) (quoting Richter,
7    562 U.S. at 103).

8         The prosecutor's theory of the case, which was articulated from the outset of trial and
9    explicitly argued to the jury in closing, was that codefendant Barajas drove the car and Petitioner
10   was the shooter. (8 RT 466–67; 13 RT 1348–49, 1352–54, 1396–98). The principal issue at trial
11   was whether the defendants were in fact the perpetrators of the offense. If the defendants were
12   found to be the perpetrators, it appeared uncontested that Barajas drove the car and Petitioner
13   was the shooter. Given the verdicts, particularly the jury finding codefendant Barajas guilty of
14   permitting another to discharge a firearm from a vehicle, the state court's harmless error
15   determination was not contrary to, or an unreasonable application of, clearly established federal
16   law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking
17   in justification that there was an error well understood and comprehended in existing law beyond
18   any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is
19   not entitled to habeas relief on his second claim, and it should be denied.

20        2.   Assault with a Deadly Weapon Instruction

21        In his fourth claim for relief, Petitioner asserts that the trial court erred by failing to
22   instruct the jury *sua sponte* on assault with a deadly weapon as a lesser-included offense to
23   attempted murder. (ECF No. 1 at 31). Respondent argues that the state court's rejection of this
24   claim was reasonable. (ECF No. 15 at 27).

25        This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate
26   District, which denied the claim in a reasoned decision. The claim also was raised in codefendant
27   Barajas's petition for review, in which Petitioner joined and which the California Supreme Court
28   summarily denied. As federal courts review the last reasoned state court opinion, the Court will

1 "look through" the summary denial and examine the decision of the California Court of Appeal.

2 See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

3     In denying the instructional error claim regarding assault with a deadly weapon as a

4 lesser-included offense to attempted murder, the California Court of Appeal stated:

5     Barajas moved for a new trial on the ground, inter alia, that the trial court erred by
failure to instruct, sua sponte, on assault with a deadly weapon as a lesser
6 included offense of attempted murder. He argued that because of the allegation in
the informations that a deadly weapon was used, such an instruction would have
7 been proper. Eudave joined in the motion. The People opposed it. The trial court
denied the motion on the ground assault with a deadly weapon, while possibly a
8 lesser related offense, was not a lesser included offense.

9     Defendants now contend they should have been granted a new trial due to the
court's purported instructional error. We disagree.
10

11     Subdivision 5 of section 1181 permits a court to grant a new trial when it has
"misdirected the jury in a matter of law ...." Generally speaking, we review a trial
12 court's ruling on a motion for a new trial under a deferential abuse-of-discretion
standard. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) It appears, however,
13 that we review instructional error arguments de novo. (*People v. Olivas* (2016)
248 Cal.App.4th 758, 772; see *People v. Banks* (2014) 59 Cal.4th 1113, 1160,
14 disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn.
3; accord, *People v. Cook* (2006) 39 Cal.4th 566, 596; *People v. Waidla* (2000) 22
15 Cal.4th 690, 733.) In the present case, our conclusion the trial court did not err is
the same under either standard.

16     " ' "It is settled that in criminal cases, even in the absence of a request, the trial
court must instruct on the general principles of law relevant to the issues raised by
17 the evidence. [Citations.] The general principles of law governing the case are
those principles closely and openly connected with the facts before the court, and
18 which are necessary for the jury's understanding of the case." [Citation.]' "
(*People v. Breverman* (1998) 19 Cal.4th 142, 154.)
19

20     "A trial court has a sua sponte obligation to instruct the jury on any uncharged
offense that is lesser than, and included in, a greater charged offense, but only if
21 there is substantial evidence supporting a jury determination that the defendant
was in fact guilty only of the lesser offense. [Citations.] An uncharged offense is
22 included in a greater charged offense if *either* (1) the greater offense, as defined
by statute, cannot be committed without also committing the lesser (the elements
23 test), *or* (2) the language of the accusatory pleading encompasses all the elements
of the lesser offense (the accusatory pleading test). [Citations.] [¶] Under the
24 elements test, a court determines whether, as a matter of law, the statutory
definition of the greater offense necessarily includes the lesser offense.... [¶]
25 Under the accusatory pleading test, a court reviews the accusatory pleading to
determine whether the facts actually alleged include all of the elements of the
26 uncharged lesser offense; if it does, then the latter is necessarily included in the
former. [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 348–349; accord,
27 e.g., *People v. Lopez* (1998) 19 Cal.4th 282, 288–289; *People v. Birks* (1998) 19
Cal.4th 108, 117–118, fn. omitted.)

28

Under the elements test, assault with a deadly weapon—or, to be more precise given the circumstances of the present case, assault with a firearm—is not a lesser included offense of attempted murder, because attempted murder can be committed without using a firearm or other deadly weapon. (*People v. Nelson* (2011) 51 Cal.4th 198, 215; *People v. Parks* (2004) 118 Cal.App.4th 1, 6; *People v. Richmond* (1991) 2 Cal.App.4th 610, 616.) Rather, it is a lesser related offense on which a trial court is not required to instruct unless all parties consent. (*People v. Nelson*, *supra*, 51 Cal.4th at p. 215; *People v. Birks*, *supra*, 19 Cal.4th at p. 136, fn. 19.) They did not do so here.

With respect to the accusatory pleading test, neither information alleged either defendant possessed the present ability to inflict injury on Ruiz. " ' Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*People v. Sanchez* (2016) 63 Cal.4th 411, 457; see *People v. Marshall* (1997) 15 Cal.4th 1, 36.) An assault, by contrast, is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Attempted murder may be committed without the present ability to inflict harm, an essential element of assault. (See *People v. Rundle* (2008) 43 Cal.4th 76, 143–144, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see generally *People v. Chance* (2008) 44 Cal.4th 1164, 1170–1171, 1172.)

Because of this basic problem, it appears defendants' contention fails, even assuming they are correct that enhancement allegations are to be considered under the accusatory pleading test. In any event, we conclude they are not correct.

In *People v. Wolcott* (1983) 34 Cal.3d 92 (*Wolcott*), the California Supreme Court held that a firearm use enhancement is not part of the accusatory pleading for the purpose of defining lesser included offenses. (*Id.* at p. 96.) The court observed that under California law, enhancement statutes do not prescribe new offenses, but merely additional punishment for offenses in which, for instance, a firearm is used. (*Id.* at p. 100.) It concluded that considering enhancement allegations as part of the accusatory pleading in defining lesser included offenses would confuse criminal trials. (*Id.* at p. 101.) It reasoned: "Present procedure contemplates that the trier of fact first determines whether the defendant is guilty of the charged offense or a lesser included offense, and only then decides the truth of any enhancements. [Citation.] The sentencing judge then decides whether to use the fact found as an enhancement to impose the upper term of the sentence, or to enhance the sentence. [Citation.] This orderly, step-by-step procedure would become muddled if evidence of the enhancement must be considered in determining guilt of a lesser offense." (*Ibid.*, fn. omitted.)

Defendants contend *Wolcott's* rationale is at odds with *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), in which the United States Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) In explaining why the label given a required finding does not control the determination whether a defendant has a Sixth Amendment jury trial right with respect to that finding, the high court observed: "[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the *functional equivalent of an element of a greater offense* than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense. [Citation.]" (*Apprendi*, *supra*, at p. 494, fn. 19, italics added.)

Seizing on the emphasized language, defendants argue an enhancement is now a fact that must be found by the jury like every other element of an offense. Accordingly, it must now be considered when applying the accusatory pleading test with respect to a trial court's sua sponte duty to instruct on lesser included offenses.

We disagree for several reasons. First, *Apprendi* and its progeny address who, as between judge and jury, must decide the existence of facts that increase a defendant's maximum authorized sentence. (*People v. Davis* (2005) 36 Cal.4th 510, 564; see *Southern Union Co. v. United States* (2012) 567 U.S. 343, ___ [132 S.Ct. 2344, 2350] & cases cited.) In light of *Apprendi's* " 'narrow' holding" (*People v. Contreras* (2013) 58 Cal.4th 123, 149) and the failure of it or its progeny to address the tests for determining lesser included offenses, we do not believe it has any effect on California law in that regard. (See *People v. Alvarez* (2002) 27 Cal.4th 1161, 1176 ["cases are not authority for propositions not considered"].)

Second, defendants' emphasis on the "functional equivalent" language (*Apprendi*, *supra*, 530 U.S. at p. 494, fn. 19) overlooks the remainder of that sentence and the high court's overall holding. The characterization of sentence enhancements as the "functional equivalent" of elements of greater offenses "means only that a defendant is entitled to have a jury determine whether those *facts* supporting an increased sentence have been proven beyond a reasonable doubt." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 137.) In the case before us, jurors were instructed on the elements of the charged offenses and enhancements, and the requirement that they be proven beyond a reasonable doubt. Their guilty verdicts and true findings thus satisfied the Sixth Amendment's requirements as articulated in *Apprendi*. (See *People v. Lewis* (2008) 43 Cal.4th 415, 521, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 918–920.)

Last, in *People v. Alarcon* (2012) 210 Cal.App.4th 432 (*Alarcon*), the Court of Appeal explained why the argument made by defendants is incorrect, and *Wolcott* remains good law with respect to the accusatory pleading test. (*Alarcon*, *supra*, at pp. 436–439.) The court discussed state high court opinions post-*Apprendi* (*Alarcon*, *supra*, at pp. 437–438; see, e.g., *Porter v. Superior Court*, *supra*, 47 Cal.4th at pp. 137–138; *People v. Izaguirre* (2007) 42 Cal.4th 126, 130–134; *People v. Sloan* (2007) 42 Cal.4th 110, 122–123; *People v. Seel* (2004) 34 Cal.4th 535, 548–550), as well as the fact the California Supreme Court has consistently held that insofar as noncapital cases are concerned, the rule requiring instructions on lesser included offenses arises *only* under California law (*Alarcon*, *supra*, 210 Cal.App.4th at pp. 438–439; see, e.g., *People v. Breverman*, *supra*, 19 Cal.4th at pp. 156–169; *People v. Birks*, *supra*, 19 Cal.4th at pp. 118–119, 127).

Defendants fail to convince us *Alarcon* was wrongly decided. It is true they have the right, under the federal due process clause, to proof of every element of the offense and the enhancements beyond a reasonable doubt, but, as we have explained, they were accorded this right by the trial court's instructions on the charged offenses and enhancements, and on the requirement of proof beyond a reasonable doubt. That *Apprendi's* holding is grounded not only on the Sixth Amendment right to jury trial, but also on the Fifth Amendment right to due process (*Apprendi*, *supra*, 530 U.S. at pp. 476–477, 484; *People v. Sloan*, *supra*, 42 Cal.4th at p. 123), does not mean defendants somehow enjoyed a right under the federal Constitution to instructions on a purportedly lesser included offense.

1  We are bound by California Supreme Court authority holding otherwise. (*Auto
2  Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

3  Eudave, 2017 WL 749010, at *9–11.

4  Beck v. Alabama, 447 U.S. 625 (1980), held that due process is violated in a *capital* case

5  "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital

6  offense, and when the evidence would have supported such a verdict." 447 U.S. at 627. The

7  Supreme Court in Beck expressly declined to determine whether due process requires giving a

8  lesser included offense instruction in noncapital cases. Id. at 638 n.14. The Ninth Circuit has

9  declined to extend Beck to noncapital cases, Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000)

10 (per curiam), and has recognized that "[t]here is no Supreme Court precedent establishing that a

11 state trial court is required to instruct on lesser included offenses in noncapital cases," Bortis v.

12 Swarthout, 672 F. App'x 754, 754 (9th Cir.), cert. denied sub nom. Bortis v. Arnold, 137 S. Ct.

13 1605 (2017). Although "'the failure of a state court to instruct on a lesser offense [in a non-

14 capital case] fails to present a federal constitutional question and will not be considered in a

15 federal habeas corpus proceeding' . . . the defendant's right to adequate jury instructions on his

16 or her theory of the case might, in some cases, constitute an exception to the general rule." Solis,

17 219 F.3d at 929 (alteration in original) (quoting Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir.

18 1984)).

19 To the extent that Petitioner asserts that the state trial court violated due process by

20 failing to instruct the jury *sua sponte* on assault with a deadly weapon as a lesser-included

21 offense to attempted murder, the Court finds that Petitioner fails to present a federal

22 constitutional question. Petitioner also fails to show that this claim falls within the exception to

23 the general rule based on a defendant's right to jury instructions on the defense theory of the

24 case. See Solis, 219 F.3d at 929. As established by defense counsel's closing argument,

25 Petitioner's theory of the case was misidentification—that the eyewitnesses' identification

26 testimony should be doubted and treated with caution. (12 RT 1360–82). Petitioner's defense

27 theory was not that the offense conduct constituted assault with a deadly weapon rather than

28 attempted murder.

Based on the foregoing, the state court's denial of Petitioner's instructional error claim with respect to assault with a deadly weapon as a lesser-included offense of attempted murder was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

### C. Sufficiency of the Evidence

In his fifth claim for relief, Petitioner asserts that there was insufficient evidence to support the jury's verdicts because the eyewitness identification of Petitioner and his codefendant as the perpetrators of the shooting was inherently unreliable. (ECF No. 1 at 31.) Respondent argues that a fairminded jurist could conclude sufficient evidence supported the attempted murder conviction. (ECF No. 15 at 31.)

This claim was raised on direct appeal in the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in codefendant Barajas's petition for review, in which Petitioner joined and which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's sufficiency of the evidence claim, the California Court of Appeal stated:

> Defendants claim the evidence was insufficient to establish they were the perpetrators, and to support the true findings on the gang enhancements. The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson, supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual

conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies equally to convictions and enhancement allegations (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1197, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Garcia* (2014) 224 Cal.App.4th 519, 522–523).

**A. The Eyewitness Identifications**

Defendants contend the evidence cannot sustain their convictions, because eyewitness identification is inherently unreliable. We conclude otherwise.

The dangers and fallibility of eyewitness identification—particularly when a witness identifies a stranger based on a single, brief observation made at a time of stress—have long been recognized. (See, e.g., *United States v. Wade* (1967) 388 U.S. 218, 228; *People v. McDonald* (1984) 37 Cal.3d 351, 363–364; *U.S. v. Russell* (6th Cir. 1976) 532 F.2d 1063, 1066.) In an attempt to demonstrate how and why the accuracy of the identifications made of defendants in the present case may have been adversely affected, defendants presented Shomer's expert testimony, summarized *ante*. (See *People v. McDonald*, *supra*, 37 Cal.3d at p. 355.)

Although Shomer testified eyewitness identification occurs at a "very low level of accuracy," and, based on a hypothetical question drawn from evidence at trial, that there was a "classic danger signal ... related to inaccuracy," at no time did he deem eyewitness identification inherently unreliable or offer an opinion as to the credibility of the various eyewitnesses. He made it clear that evaluation was the jury's responsibility.

Under the evidence presented here, the credibility of the witnesses and the accuracy of their identifications properly were left to the jury. (See *Perry v. New Hampshire* (2012) 565 U.S. 228, 245–246; *People v. Boyer* (2006) 38 Cal.4th 412, 481.) Defense counsel had a full opportunity to cross-examine the witnesses "about all aspects of the identification process" (*People v. Boyer*, *supra*, at p. 481), and the witnesses' identifications of defendants—particularly those made by Ruiz, who was acquainted with both men—"were neither physically impossible nor inherently incredible." (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

"[W]hen the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court. [Citation.]" (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Because a rational trier of fact could have found Ruiz's identifications of defendants credible, reversal of defendants' convictions is not warranted. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 997; *People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) We reject defendants' attempts "to reargue the evidence on appeal and reiterate that 'it is not a proper appellate function to reassess the credibility of the witnesses.' [Citation.]" (*People v. Thompson*, *supra*, 49 Cal.4th at p. 125.)

Eudave, 2017 WL 749010, at *11–12.

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 556 U.S. 1, 2 (2011). Moreover, when AEDPA applies, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id.

In light of the verdict, the jury clearly found the eyewitnesses' identification testimony to be credible, and "under Jackson, the assessment of credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). See also Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are therefore entitled to near-total deference under Jackson."). Under this "near-total" deferential standard of review, the state court's denial of Petitioner's sufficiency of evidence claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fifth claim, and it should be denied.

///

# IV.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**January 24, 2019**__          /s/ _Erica P. Grosjean_

UNITED STATES MAGISTRATE JUDGE